

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

BTK:AA
F. # 2022R00378

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 10, 2023

By ECF

The Honorable Eric Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Darnell Burgess
     Criminal Docket No. 22-557 (EK)

Dear Judge Komitee:

   The government respectfully submits this letter in advance of the defendant Darnell Burgess's sentencing, which is scheduled for August 17, 2023, at 2:30 p.m. On January 18, 2023, the defendant waived indictment and pleaded guilty to an Information charging him with attempted interstate transportation and receipt of explosives with intent to kill, harm or intimidate in violation of Title 18, United States Code, Section 844(d). On July 11, 2023, the Court accepted the defendant's plea. For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 15 to 21 months' imprisonment.

I. Background

   A. Offense Conduct

   The defendant's conduct is outlined in the Probation Department's Presentence Investigation Report ("PSR"), dated April 5, 2023. As discussed below, the defendant attempted to construct an explosive, ordering bombmaking ingredients and downloading detailed explosive recipes and instructions from the internet—while at the same time, threatening to kill or harm several victims with bombs.

   In April 2022, the defendant lived at Atlantic House Men's Shelter, an emergency housing facility located in Brooklyn. On April 8, 2022, staff members at the facility contacted the New York City Police Department ("NYPD") to report several suspicious packages that arrived at the facility and were addressed to the defendant. These packages contained a carbon dioxide tank, charcoal, potassium nitrate, and wires. PSR ¶ 5. Subsequent investigation by law

enforcement revealed that the defendant also placed orders via Amazon for other explosive components, including sulfur powder, potassium nitrate, one-hundred feet of copper wire, and a wireless remote-control switch.  Id.; Complaint ¶ 3.  According to Atlantic House staff, the defendant had previously acquired a canister of gasoline and ballistic armor vests.  PSR ¶ 5.  Such materials can collectively be used to create black powder, an explosive.

After this incident, the defendant was evicted from Atlantic House and was committed to the Montefiore Hospital for 18 days in a mental hospital for psychological treatment.  While there, he made threats to physically harm members of the hospital's staff, PSR ¶ 6, resulting in an order of protection being filed against the defendant.  Id.  On April 18, 2022, after his release from the hospital, the defendant was remanded to Rikers Island Correctional Facility for thirty days for violations of his New York State probation conditions.[1]  PSR ¶¶ 6-7.  While incarcerated, the defendant tried again to receive and build a bomb, contacting several relatives and friends by phone to ask them to purchase supplies.  PSR ¶ 7.

According to the PSR, the defendant suffers from mental health conditions, including bipolar schizophrenia, attention-deficit/hyperactivity disorder, and anxiety.  PSR ¶ 49.  After his release from Rikers Island, he was assigned an Intensive Mobile Treatment Team ("IMT Team") to treat his mental health conditions.  PSR ¶ 51.  While on this plan, he tried to acquire bombmaking ingredients; shelter officials confiscated remote transmitters, a carbon dioxide tank, wire, a scale, and sulfur powder from the defendant's possession.  PSR ¶ 12.

Searches of the defendants' cellphone revealed that he researched how to construct a bomb.  He downloaded the "Anarchist's Cookbook," a set of bombmaking instructions, as well as documents detailing NYPD's response to mass shootings, diagrams and images on explosive construction, and instructions on building a detonator.  PSR ¶ 10.  The search of the defendant's cellphone also revealed that he had a fascination with mass-casualty events and routinely researched school shootings, suicide bombings, and related attacks.  His Internet search history included terms such as "attempted murder nys charge," "capital murder," "police killings ny," "thermobaric bomb vs nuclear," and "where can I buy potassium nitrate."  Complaint ¶ 6.

While the defendant was attempting to construct a bomb, he made violent threats.  In April 2022, the defendant threatened staff at Atlantic House after they refused him access to seized packages, and verbally threatened staff at a psychiatric hospital.  PSR ¶ 6.  In September 2022, he was removed from a separate shelter for threatening a mass shooting and he made social media posts threatening to bomb a public housing complex, as described below.  PSR ¶ 9, 13.

As detailed in the PSR, the defendant made violent threats towards women on social media.  On July 29, 2022, two women, whose identities are known to the government, Jane Doe 1 and Jane Doe 2, reported that they had received violent messages from the defendant via Facebook Messenger.  The next day, the defendant threatened these women again, writing

---

[1] The defendant's temporary incarceration at Rikers Island was the result of non-compliance with court-ordered mental health referrals and other conditions of his probation.

2

"I'm omw rn[2] someone losing they house" and "RELAY THIS MESSAGE TELL [JANE DOE 1] I SAID U ALL VIOLATED ALL OF U AND IM ON YA AND FUCC YA DEAD AND UR FAMILY GMK[3] FOR LIFE IM ON YA" and "IMMA MAKE YA KILL ME TO NYPDK." PSR ¶ 9. He also made a post that read "A BOMB" that was followed by an emoticon depicting a bomb. Id., Complaint ¶ 9.

In addition, a search of the defendant's Facebook messages revealed that, in or about the summer of 2022, he was attempting to purchase a firearm. For example, on or about August 2, 2022, the defendant wrote to a contact "need a gun" and "beef in NYC hot" "like I might die hot." See PSR ¶ 9. An earlier Facebook message from January 1, 2022 shows the defendant attempting to purchase an assault weapon and gun license from another individual. Both attempted gun purchases would have contravened the defendant's conditions of his State probation—that he not possess weapons without express permission from the Court or Probation Department. See NY State Probation Conditions ¶ 12.

B. Criminal History

On November 14, 2017, the defendant made a phone call to Woodward Children's Center in Freeport, New York, threatening to "shoot the place up" and indicating that he planned to target three specific students. PSR ¶ 30. He made similar threats on social media, and posted on Facebook that he intended to target other students and school administrators. Id. The defendant was arrested and charged with Aggravated Harassment in the Second Degree. For this offense, the Nassau County First District Court sentenced the defendant to three years of probation.

While on probation, the defendant failed to adhere to court-ordered treatment for his mental health conditions, failed to report to his probation officer on numerous occasions, and failed to provide proof of enrollment in a GED program, among other violations. PSR ¶ 30.

C. Defendant's Sentencing Memorandum

By letter filed on August 8, 2023, Def. Mem., ECF No. 32, the defense seeks a non-incarceratory sentence. The letter primarily argues that the defendant's criminal conduct—trying to construct a bomb and threatening several victims—is excused by the defendant's mental illness, and that incarceration would impede the defendant's progress in mental health treatment.

---

[2] The government understands "I'm omw rn someone losing they house" means I'm on my way right now and threatening to destroy a home. Unless otherwise noted, all text messages quoted above are reproduced verbatim.

[3] The government understands GMK to be an abbreviation for "Glenmore killer." Glenmore refers to the public housing complex Glenmore Plaza, located in Brooklyn.

II.     Guidelines Calculation

As set forth in the PSR, because the defendant is charged with a violation of 18 U.S.C. § 844(d), and because he was a prohibited person at the time of the offense (as discussed below), the base offense level is 16. PSR ¶ 19. Accounting for his timely acceptance of responsibility, the total offense level is 13. The defendant's criminal history score is three, which establishes a criminal history category of II.[4] PSR ¶ 31-33. This carries a Guidelines range of 15 to 21 months' imprisonment. PSR ¶ 63.

The defendant is a prohibited possessor of firearms or explosives under U.S.S.G. § 2K1.3(a)(4)) because he has been involuntary committed to a mental hospital. The defendant was involuntarily admitted to a mental hospital on April 8, 2022 for "acute psychiatric inpatient treatment" and released 10 days later. A few months later, on August 10, 2022, the defendant was involuntarily admitted to a mental hospital for a second time and discharged 23 days later. The defendant's medical records make clear that this admission was subject to N.Y. Mental Hygiene Law § 9.27(a) and based on the certification of two doctors. See Ex. A (Medical Records Excerpt) (noting that patient admission was involuntary under "9.27" and subject to "2 PC," i.e. two physician certifications). Under binding Circuit precedent, that qualifies as a mental health adjudication, rendering the defendant a prohibited possessor of firearms and explosives. See United States v. Waters, 23 F.3d 29, 32-34 (2d Cir. 1994) (involuntary hospital admissions under N.Y. Mental Hygiene Law § 9.27(a), based on the certification of two doctors, qualify as mental health adjudications for purposes of statute criminalizing possession of weapons by persons who had been committed to a mental institution). In apparent recognition of his prohibited status, the defendant stated at his arraignment, when the Court warned the defendant that he cannot possess firearms or explosives, "[b]y federal law … I'm special need, I can't have [firearms or explosives] anyway." Oct. 11, 2022 Tr. at 59.

In addition, the defendant was also a prohibited possessor because, during his April and August 2022 hospital admissions, he admitted to abusing cannabis and K2, a synthetic cannabinoid and Schedule I controlled substance. See Ex. B at 2 (Medical Records Excerpt).

III.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United

---

[4] The Plea Agreement underestimated the defendant's criminal history score. According to the PSR, the defendant has three criminal history points and a criminal history category of II based on one prior criminal conviction (one point) and an enhancement for committing the instant offense while on probation (two points). PSR ¶¶ 31-35. The government agrees with the Probation Department's calculation. See Plea Agreement ¶ 3 (the Guidelines estimate in the plea agreement is non-binding).

4

States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court clarified the proper procedure and order of consideration for sentencing courts as follows: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider, among other factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

IV.    The Appropriate Sentence

The government respectfully requests that the Court impose a sentence that falls within the applicable Guidelines range of 15 to 21 months' imprisonment.

First, the nature and circumstances of the offense militate in favor of a Guidelines sentence. 18 U.S.C. § 3553(a)(1). The defendant attempted to construct a bomb and threatened to use it to kill or hurt several victims or their homes—conduct that is terrifying and serious.

On at least three occasions, the defendant sought to purchase bomb components. These attempts extended over many months, including when he was incarcerated on Rikers Island. These attempts further continued even after the defendant was provided with the help of the IMT Team.[5] PSR ¶ 8. Aside from ordering the parts, the defendant also searched and

---

[5] IMT Teams provide intensive and continuous support and treatment to individuals right in their communities, where and when they need it. Clients have had recent and frequent contact

downloaded bombmaking and detonator instructions while researching mass shootings. Although the defendant's bomb efforts were thwarted by shelter staff, that was by no means guaranteed, and the defendant's conduct thus remains serious and deserves punishment.

Second, the defendant's history and characteristics weigh in favor of a Guidelines sentence. Although the defendant has mental health conditions and a lack of permanent housing that serve as mitigating factors, they are offset by the defendant's resistance to treatment, his threatening conduct, and his violations of pretrial release conditions. Moreover, the defendant repeatedly refused to comply with mental health treatment, including by failing to comply with State probation conditions and by obstructing the IMT Team's care. PSR ¶ 51.

Indeed, the defendant has failed to comply with both the terms of pretrial release in this case even with intensive treatment. Contrary to the defense's argument, Def. Mem. 4, the defendant has not been compliant with the terms of his pretrial release: (a) he has repeatedly tested positive for marijuana (which is particularly concerning for someone like him, given that marijuana use is associated with heightened paranoia), and (b) he has violated home detention restrictions by traveling outside his home without advance permission and then lying about it to his pretrial services officer. See ECF No. 27; Pretrial Services Violation Hearing Memo dated June 13, 2023 (detailing positive drug test results on November 28, 2022, April 5, 2023, May 10, 2023, and May 30, 2023 and the defendant's violation of his location monitoring condition).

Moreover, the defense submissions argue that the defendant's threatening conduct is excused by the defendant's mental illnesses. See Def. Mem. 7 (mental illness might make it more difficult for a person to comply with the law). But these submissions ignore that the vast majority of persons who suffer from mental illness do not engage in such behavior.[6] Accordingly, a Guidelines sentence would punish the defendant, not for his illness, but for his pattern of threatening and dangerous bombmaking conduct.

Third, a sentence within the Guidelines range would serve to deter the defendant and others from committing similar crimes. See 18 U.S.C. § 3553(a)(2)(D). Specific deterrence weighs heavily here. Contrary to the defense characterization of the defendant as someone "who isn't a threat to anyone," Def. Mem. 8, the defendant has engaged in a repeated and years-long pattern of threatening to kill or harm others with no apparent remorse or change in behavior. After threatening a school shooting for which he was convicted in New York State, the defendant

---

with the mental health, criminal justice, and homeless services systems, recent behavior that is unsafe and escalating, and who were poorly served by traditional treatment models. IMT teams include mental health, substance use, and peer specialists who provide support and treatment including medication, and facilitate connections to housing and additional supportive services." See IMT Teams, NYC Mayor's Office of Community Mental Health (Nov. 10, 2019), https://mentalhealth.cityofnewyork.us/program/intensive-mobile-treatment-imt.

[6] "Most people with mental health conditions are no more likely to be violent than anyone else. Only 3%–5% of violent acts can be attributed to individuals living with a serious mental illness." See Mental Health Myths and Facts, Substance Abuse and Mental Health Administration, https://www.samhsa.gov/mental-health/myths-and-facts.

was sentenced only to probation with mental health treatment. PSR ¶ 30. But his conduct did not improve after that non-incarceratory sentence and medical treatment. To the contrary, it escalated from threats of violence to attempts to build a bomb and acquire firearms while making threats of violence. A Guidelines sentence would serve to punish and deter the defendant from reengaging in his threatening conduct.

A Guidelines sentence would also serve the goals of general deterrence. Through a Guidelines sentence, this Court will communicate that individuals who construct or receive explosives, a crime that exposes the public to great danger, will be punished. Further, the defendant's sentence should consider that his attempted bombmaking, which can be done by a lone individual using legally acquired precursor materials, can be difficult for law enforcement to uncover. Had the defendant's packages not been searched, or had he not been residing in an emergency housing facility, it is possible that he would not have been discovered until after he had constructed or used a bomb.

<u>Fourth</u>, the defense asserts that the defendant "would inevitably decompensate in a prison setting" and would be "dumb[]." Mem. 8-9. But BOP prison facilities administer medication, including psychiatric medication, at facilities across the country every day. Further, this Court can order that the defendant reinitiate his mental health treatment as a condition of his supervised release. Thus, a Guidelines sentence would appropriately punish the defendant and deter him from committing future crimes, while permitting him to reengage with his treatment after his sentence concludes.

V.      <u>Other Conditions of Sentencing</u>

Consistent with the Court's Individual Rules ¶ VI.A.4, the government notifies the Court that it does not seek any forfeiture, restitution or fine in this case. The government further submits that, in addition to the term of imprisonment sought above, a term of supervised release within the applicable Guidelines range of 1 to 3 years is appropriate. PSR ¶ 64 (citing U.S.S.G. § 5D1.2(a)(2)). Such term of supervised release is reasonably calibrated to ensure that the defendant attends any ordered mental health treatment and avoids re-engaging in threatening or bombmaking activity.

VI.     Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the Guidelines range of 15 to 21 months' imprisonment.

        Respectfully submitted,

        BREON PEACE  
        United States Attorney

By:   /s/ Adam Amir  
       Adam Amir  
       Assistant U.S. Attorney  
       (718) 254-6116

cc:    Counsel for Defendant (by ECF)  
       Clerk of Court (by ECF)  
       U.S.P.O. Erica Vest (by E-mail)